UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF ILLINOIS EASTERN DIVISION

JANE DOE

   vs.

CRANE AND NORCROSS
and JAMES BOYLE

No. 2024-cv-001688

JURY DEMAND

## SECOND AMENDED COMPLAINT

Now comes the Plaintiff, Jane Doe, and in support of her Complaint against the Defendants, CRANE AND NORCROSS, and JAMES BOYLE.

### THE PARTIES

1. At the time complained of herein, plaintiff Jane Doe resided in Chicago, Illinois

2. That CRANE AND NORCROSS, (hereinafter "C&N"), is a corporation registered in the State of Illinois and does business in Chicago, Illinois.

3. That JAMES BOYLE is an attorney registered in the State of Illinois and does business in Chicago, Illinois.

### JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over plaintiff's federal claims pursuant to the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq.

5. This Court has personal jurisdiction over the defendants as all actions complained of herein occurred in Chicago, Illinois.

6. Venue is proper in this district because all the conduct complained of herein occurred in this district.

## NATURE OF THE CASE

7. Plaintiff was an employee of the defendants corporation; the law firm of C&N as is more fully described below.

8. The Complaint arises out of her employment, alleging violations of the Americans with Disabilities Act, Illinois Human Rights Acts, privacy rights violations, including HIPAA, negligent and intentional infliction of mental distress, seeking actual and punitive damages.

## PLAINTIFF'S PSEUDONYM

9. Plaintiff's Complaint is inextricably intertwined with her past psychological disability, including PTSD and the highly personal events which led to her underlying trauma, Plaintiff asked the court for permission to continue her claim under the pseudonym "Jane Doe," to protect the privacy, limit public dissemination of the facts surrounding her medical and psychological and medical history.

## FACTS COMMON TO ALL CAUSES OF ACTION

10. At all is relevant hereto, Plaintiff was employed by Defendants Law Firm C&N as a Property Tax Paralegal. James Boyle is and was an attorney and managing partner with the firm, was Plaintiff's direct report, and was the major decision-maker in the claimed of events.

11. The Complainant, "Jane Doe", was employed by the law firm of a C&N ("CN")' from November 18, 2019, to March 10, 2022, at which time she was fired. Because of the sensitive nature of her disabilities, Complainant requests her name be redacted from all published documents and a random pseudonym be assigned.

12. CN is a law firm incorporated in the State of Illinois specializing in the area of real estate tax appeals. At all times relevant hereto it employed more than 30 people, including Ms. Doe in Illinois.

13. Ms. Doe's position at CN was that of Property Tax Paralegal, in general, her duties were to analyze real estate valuations as compared to current market values to relieve homeowners and business owners from overvaluation of their real estate taxes.

2

This entailed working alone on a computer almost 100% of the time.

14. On March 16, 2020, the firm announced that employees would begin working remotely from their homes because of the Covid epidemic. From this time until Ms. Doe's employment was terminated, she continued to work remotely from home 100% of the time.

15. On March 19, 2021, while still working 100% remotely, Ms. Doe received her employee review from her supervisor Mr. Thomas Boyle. Mr. Boyle is an attorney and one of the managing partners of the firm. Ms. Doe received a satisfactory review and Mr. Boyle told Ms. Doe, "You are doing a great job", and "We are lucky to have you on the team".

Ms. Doe received a substantial bonus for her performance. This was the last review Ms. Doe received prior to being terminated.

16. On May 10, 2021, Ms. Doe received another email from Boyle, explaining it was the firm's decision that all employees would be returning and once again working in-house at the office. At this time the Covid epidemic was still active. The email stated that returning to the office would be on a hybrid schedule and begin June 14, 2021.

17. Once Ms. Doe learned that she was going to be required to return to work at the office, she experienced uncontrollable levels of anxiety, depression and sleeplessness from concern and fear of commuting to work on public transportation and working in proximity with others during a time of epidemic. Her symptoms became so severe that she required additional psychiatric medication and therapy sessions to cope with her insomnia relapse, increased anxiety, and depression.

18. On May 18, 2021, Ms. Doe emailed Mr. Boyle with a request for accommodation allowing her to continue to work from home when the office reopened as recommended by Usman Bhaktawar, her Certified Psychiatric Assistant ("PA-C").

19. On May 18, 2021, Mr. Boyle emailed Ms. Doe acknowledging that he received her request for accommodation. His email neither agreed to nor denied the request for accommodation, however, Mr. Boyle asked her to provide medical documentation of her

3

disability, the medication she was taking an explanation of how the disability prevented her from performing, remaining on task, or getting to the workplace.

20. On June 7, 2021, Ms. Doe emailed Mr. Boyle a letter from her PA-C, explaining that she was diagnosed with PTSD (posttraumatic stress disorder), GAD (generalized anxiety disorder), ADHD (attention - deficit hyperactivity disorder) and requesting that she be excused from having to return to the office environment at that immediate time, but instead be accommodated by allowing her to be able to continue to work remotely from home when the office reopened.

21. On June 10, 2021, Mr. Boyle emailed Ms. Doe asking her to speak with him to update her on everything regarding work.

22. June 11, 2021, 3:08 PM EST, Mr. Boyle called to inform Ms. Doe that the firm approved her accommodation to "work remote on a six-month trial basis. The letter from the PA-C did not put a six-month cap on the request for accommodation. The six- month "trial" was apparently Mr. Boyle's decision. Her employment was not on a "trial basis" until she made her disabilities known to CN and asked for accommodation. She was grateful for the opportunity to continue working remotely and was confident she would continue to have no problem in meeting her employers' reasonable expectations during such a "trial".

23. On June 14, 2021, Mr. Boyle emailed Ms. Doe confirming his verbal authorization to remain remote on "a six-month trial basis."

24. June 14, 2021, employees started returning to the office on a rotating hybrid basis alternating two days in office/three days at home one week and two days at home/three days in office with the other week.

25. On August 18, 2021, Ms. Doe emailed Mr. Boyle asking to speak with him, inquiring about his assessment of performance since being granted her accommodation to remain 100% remote. Her last prior review was on March 19, 2021, for which she was given a satisfactory performance review and a substantial bonus.

26. August 27, 2021, at 9:21 am, Ms. Doe emailed Mr. Boyle once again requesting feedback on her performance. Ms. Doe called Mr. Boyle that same day at 11:27 am. He did not directly respond to Ms. Doe's request for feedback regarding satisfaction with her job performance working remotely other than to say he would reach out to her "Signors" (supervisors) and that he would get back to her right away.

27. On October 26, 2021, Boyle sent Ms. Doe an email saying that CN needed Ms. Doe's office since she had no immediate plans of returning to the office:

*"we have hired additional staff fand have run out of office space. Since you are working remotely with no current plans to return to the office, we would like to use your office for a new employee that will be working in the office. We would obviously provide you an office if you decide to return to the office. We will be boxing your stuff up as we prepare the office. We can leave it in a closet in the office if you would like."*

28. By mid-December 2021, the six-month period Mr. Boyle described as being Ms. Doe's "trial" period, came and went with no word from anyone and no complaints about Ms. Doe's job performance.

29. On February 10, 2022, (eight months after the six month "trial" began) Mr. Boyle emailed Ms. Doe to discuss the requested feedback on her performance.

30. February 16, 2022, at 4:19 PM Mr. Boyle called Ms. Doe and told her that "everyone really likes you" and that her reviews were "mixed". He was asked but did not describe what was meant by "mixed".

31. On February 16, 2022, at 4:40 PM Ms. Doe asked him if he would provide her with a summary or examples of her "signors" concerns so she could discuss them with her therapist and psychiatrist and come up with a plan to do better moving forward. Thus, initiating the interactive process to determine whether an effective and reasonable alternative accommodation or additional accommodation was available.

32. On February 17, 2022, at 9:30 AM, Ms. Doe, sent Boyle an email reiterating her

5

request for her "signors" feedback by Monday, February 21, 2022, to present said feedback to her mental health providers in order to be able to have a full and productive conversation with them and to develop an actionable plan in an ongoing effort to discuss additional accommodations that would address any perceived performance issue and allow her to continue her work. At 4:03 p.m., Mr. Boyle responded with an email saying he would not be able to meet the requested February 21 deadline because of upcoming surgery.

33. On March 2, 2022, Mr. Boyle emailed Ms. Doe her performance review.

34. On Monday, March 7, 2022, Ms. Doe met with her therapist, Maria Bucci, who told her that she believed any progress she was making in her mental health would suffer if

she required to return to the office any time in the immediate future.

35. Also, on that date (March 7) Ms. Doe met with Joanne Pichla, the firm's human resources person who asked her questions about a previous report to Pichla wherein Ms. Doe told Pichla she felt she was being treated differently after her request for accommodation and differently from how others were being treated. Ms. Doe said that she would provide Pichla with a list prior to a TEAM (remote) meeting planned for March 9, 2022, at 2:00 PM.

36. On March 8, 2022, Mr. Boyle sent Ms. Doe an email stating that Ms. Doe had not logged into in her job until after 10:00 AM on both Monday and Tuesday mornings. This was the first and only time Ms. Doe knows of that her logins were being monitored. Boyle also demanded that Ms. Doe respond to the request to return to the office and respond to their inquiry of her complaint that she was being treated differently since her request for accommodation. The criticism of the claim of not logging on at a specific time was a new type of scrutiny. She had never previously been subjected to and she had never heard of anyone else at CN being subjected to such scrutiny. There were legitimate reasons Ms. Doe was unable to log on.

37. Also on March 8, 2022, Ms. Doe emailed Joann Pichla asking her whether Ms.

6

Doe's employment with CN was contingent on her returning to work at the office without an alternate accommodation or any discussion of one. Initiating the engagement of the interactive process. Ms. Doe offered to reschedule a planned TEAMS meeting (scheduled for the following day, March 9, 2022) to allow time for Mr. Boyle to let her know whether employment was contingent on returning without accommodation.

38. Again, on March 8, 2022, at 8:34 PM Ms. Doe emailed Mr. Boyle asking him to discuss potential alternative accommodations with the CN partners. Ms. Doe explained to Boyle that it seemed she was being ordered to return to the office without accommodation or she would not be allowed to continue her employment with CN and requesting clarification. She explained, "I cannot make decisions without knowing my options, and must discuss them with my mental health providers and doctors." Once again, engaging in the interactive process.

39. On March 9, 2022, at 1:41 PM (19 minutes prior to the scheduled TEAMS meeting) Ms. Doe received another email from Ms. Pichla. This email again avoided responding to Ms. Doe's question as to whether she would be required to return to work without accommodation and did not address her request for an interactive conversation to discuss options, if any. Instead Pichla's email stated there was no need for a TEAMS meeting unless Ms. Doe provided examples of how she felt she was being treated differently since her initial request for accommodation. Pichla did not, however, actually cancel the 2:00 meeting.

40. On March, 9, 2022, at 2:00 PM, Ms. Doe remotely joined the scheduled TEAMS ready to discuss the outstanding issues including how she was being treated differently from others and having an interactive conversation about accommodation or other options. No one from CN joined in on the meeting so Ms. Doe has no choice but to log off without speaking with anyone.

41. On March 10, 2022, without any more discussion, Ms. Pichla informed Ms. Doe by email that her employment was terminated, effective immediately.

42. At all times, from the time she was hired until her termination, Ms. Doe

7

job performance met or exceeded from employers' legitimate expectations.

43. At all times from the time when she initially requested accommodation until her termination Ms. Doe was a "disabled" individual as defined by both the Illinois Human Rights Act and the Americans with Disabilities Act.

44. At all times, from the time when she initially requested accommodation until her termination, Ms. Doe's employer, CN, regarded Ms. Doe to be an individual with disabilities.

45. CN refused and failed to engage in the interactive process to see if employment could be continued with or without accommodation. CN simply refused to even consider the very idea of accommodation.

46. Ms. Doe's requests for accommodation and requests for an interactive discussion were protected activities under both the Illinois Human Rights Act and the ADA.

47. CN's decision to terminate Ms. Doe's employment was discriminatory in that it was made solely because of her disability or her employer's perception of disability, and in retaliation for her assistance on accommodation for her disabilities and for an interactive dialogue to whether there may have been alternative accommodations or arrangements would allow her to continue her employment in a way satisfactory to CN while meeting her own need for accommodation.

### HIPPA 42 U.S.C. §1320 and Illinois Mental Health and Developmental Disabilities Confidentiality Act 740 ILCS 110/1 *et seq.*

1. On June 11, 2021, Boyle and Ms. Doe had a phone conversation on the sensitive nature of the PA-C's accommodation recommendation letter, the letter and its content would remain confidential and no one outside of himself would be told about it. Ms. Doe reiterated her need for discretion in an email of February 17, 2022, asking Mr. Boyle to bypass the protocol to obtain the required approval from all four of her signors for time off for her upcoming neuro-psychological assessment appointment. a 4-to-6- hour appointment. Notwithstanding this assurance, Ms. Doe

discovered this information was shared by email with the other signors and possibly others.

WHEREFORE, Plaintiff prays as follows:

A. The court enter a Declaratory Judgment, declaring the Defendants have violated the right to a reasonable accommodation of her disabilities as required by the Americans with Disabilities Act. the Illinois Human Rights Act; Andrew privacy rights including her rights under HIPPA;

B. Actual and punitive damages and various violations of rights;

C. Reasonable attorney fees;

D. For such other remedies this court may deem just and appropriate.

Jane Doe
5630 North Mango Avenue
Chicago, Illinois 60646
(773) 558-3960
Zinguru16@gmail.com